**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Attorneys for Plaintiff and the Class*

[Additional counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH R. ZALESKI, JR., Individually and on Behalf of All Others Similarly Situated, | Civil Action No.: |
| *Plaintiff*, | |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| NOVO NORDISK A/S, LARS REBIEN SORENSEN and JESPER BRANDGAARD, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff Joseph R. Zaleski, Jr. ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Novo Nordisk A/S ("Novo Nordisk" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased Novo Nordisk American Depositary Receipts ("ADRs") between February 5, 2015 and October 27, 2016, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's claims are asserted against Novo Nordisk and certain of Novo Nordisk's executive officers and directors.

2.     Novo Nordisk is a Danish multinational pharmaceutical company with production facilities in eight countries, and affiliates or offices in 75 countries.  Novo Nordisk manufactures and markets pharmaceutical products and services.  In particular, Novo Nordisk is the world's largest insulin-maker and provider of medicines and devices for diabetes and obesity.  The Company makes several drugs under various brand names, including Levemir, NovoLog, Novolin R, NovoSeven, NovoEight and Victoza.

3.     According to an analysis prepared by the *Washington Post*, over the past two decades, Novo Nordisk was able to raise the price of its insulin drugs 450% above the rate of inflation even though the original patent for insulin expired 75 years ago.  Moreover, these price increases often increased in lock-step with price increases by the Company's purported competitors.  In parallel, Novo Nordisk's earnings soared between 2010 and 2015, delivering 12% annual sales growth, 20% growth in operating profit, and 22% growth in earnings.

4.     After years of consistently raising prices for insulin, however, the oligopoly Novo Nordisk had created began to experience significant pressure from United States payers beginning in 2015.  As a result, the oligopoly dismantled and many of the Company's competitors negotiated with U.S. payers to cut or flatten their prices in order to retain lucrative contracts with pharmacy benefit management ("PBM") organizations – functional middlemen between pharmaceutical

companies and consumers that suppress the cost of drugs by switching patients to generic versions of medicines, and by pitting manufacturers of branded drugs against each other.

5. While many of Novo Nordisk's competitors lowered their prices, Novo Nordisk maintained its aggressive pricing of its insulin-related products and further undertook large stock buybacks to stabilize its ADR price. Of note, Novo Nordisk is controlled by its majority shareholder, Novo A/S, which holds approximately 25% of its shares and a majority 75% of its voting shares. This power concentration away from normal market mechanisms and large capital resources accumulated over nearly ten decades of huge profitability from the global diabetes markets may to a large degree have compelled stock buybacks to help stabilize the Company's ADR price in the face of this increased scrutiny – until recently.

6. Some time since or after February 5, 2015, Novo Nordisk and certain of its officers and directors have misrepresented the Company's business prospects, and ability to maintain sustainable revenue. For example, these materially false and misleading statements included, among others, that:

- The Company had "a very robust long-term strategy and excellent execution...[and] the capabilities needed to execute them;"

- Novo Nordisk would be able to achieve a "long-term target for operating profit growth at 10%, underlying [the Company's] confidence in the growth outlook of the company;"

- "[T]here will be increasing demand for our products for many years to come;"

- The Company "expect[s] to see most of [the Company's] growth in the coming years" in North America;

- "Sales growth for 2016 is expected to be 5-9% measure in local currencies [which] reflects expectations for continued robust performance for the portfolio of modern insulin, Victoza and Tresiba;" and

- "Novo Nordisk provides innovation for the benefit of all the Company's stakeholders [and] foundation that makes it possible to optimize the use of

resources and maximize value creation in a sustainable way."

7.     Moreover, throughout the Class Period, Defendants reported impressive revenue, operating profit growth and sales growth, and informed investors that the Company would achieve sales and operating profit growth of between 5% and 9% in 2016, as well as 10% operating profit growth over the long-term.  All the while, however, Defendants were informed by the company's U.S. organization and could infer from other data sources that Novo Nordisk's aggressive pricing model produced unsustainable revenues, and its inflated earnings and profit forecasts concealed the true extent of the pricing pressures the Company was experiencing, yet continued to misrepresent the efficacy of its business model while perpetuating a massive stock buyback program to stabilize its ADR price.

8.     Novo Nordisk first announced its share repurchase program on May 11, 2015 for up to Danish Krone ("DKK") 17.5 billion to be executed during a 12-month period beginning January 30, 2015.  Under this program, Novo Nordisk initiated its first major stock buyback on April 30, 2015, intending to repurchase the Company's B shares for an amount up to DKK 9.3 billion between April 30 and October 21, 2015.  This repurchase was followed almost immediately by the initiation of a second stock buyback on December 24, 2015, intending to repurchase additional Company B shares for an amount of up to DKK 4.5 billion between October 29, 2015 and February 1, 2016.

9.     The repurchases continued in this back-to-back fashion over the course of 2016 and into the recent 2017 fiscal year.  For instance, on February 3, 2016 – only two days after the last share repurchase program had completed – Novo Nordisk initiated a third stock buyback to repurchase B shares for an amount of up to DKK 14 billion in the period from February 3, 2016 to April 27, 2016.  The buyback was followed by a fourth buyback initiated on April 29, 2016 to

repurchase B shares for an amount up to DKK 3.5 billion between April 29, 2016 and August 3, 2016, a fifth buyback initiated on August 5, 2016 to repurchase B shares for an amount up to DKK 3.4 billion until October 26, 2016, and a sixth buyback initiated on October 28, 2016 to repurchase B shares for an amount up to DKK 4.5 billion until January 31, 2017.

10.     The Company's aggressive buyback and stabilization strategy hit a major stumbling block when, on August 2, 2016, Novo Nordisk's Victoza – a diabetes treatment that dominates its class of drugs – was placed on the exclusion list for at least the second consecutive year by Express Scripts Holding Co. ("Express Scripts").  Express Scripts is the largest PBM organization is the U.S., meaning it is the largest third-party administrator ("TPA") of prescription drug programs for commercial health plans, self-insured employer plans, Medicare Part D plans, and state and federal employee plans.  Victoza was placed on the exclusion list mainly due to the Company's price inflation of the drug.  In contrast, Novo Nordisk's competitors were placed on the preferred list, indicating that the Company refused to concede in pricing negotiations.  On this news the Company's ADR price declined 3.2 percent from $57.05 per share on August 1 to $55.20 per share on August 4, 2016.

11.     Only days later, on August 5, 2016, with the continued formulary exclusion fresh on investors' minds, Novo Nordisk announced second quarter financial results for the 2016 fiscal year.  Therein, the Company reluctantly "narrowed" its forecast for full-year profit growth and said it expected tough competition in the US to pressure prices next year, with then-Chief Executive Officer ("CEO") Lars Rebien Sorensen ("Sorensen") revealing: "In the USA, the market environment is becoming increasingly challenging and contract negotiations for 2017 have reflected an intensifying price competition." Specifically, the Company announced expected 2016 growth of 5 to 8 percent in operating profit in local currencies, "narrowed" from an earlier

forecast of 5 to 9 percent.  Similarly, sales were revised to growth rates of 5 to 7 percent from an earlier forecast of 5 to 9 percent.  On this news, the Company's ADR price declined 14.6 percent from $55.20 per share on August 4 to $47.13 per share on August 8, 2016.

12.     This extreme market reaction demonstrates a shock to both investors and the general market because, as recently as the first quarter 2016 earnings release on April 29, 2016 and all the way through August 4, 2016, Novo Nordisk had maintained its 2016 expectations in terms of sales and operating profit growth of 5 to 9 percent.  The external corporate communications to investors had also reflected this sentiment.  The price of Novo Nordisk's ADRs declined a total of 18.9% in August alone, from $57.05 per share on August 1 to $46.72 per share by August 31, 2016.  This represents a market cap and investor loss of over $20 billion, much of which could have been prevented by honest and truthful communication of market realities during the preceding 12-18 months.

13.     Notably however, even the August 5 revelation itself was tempered by the Company's attendant affirmations that the revised guidance was stable and supported by the Company's business model, stating:

> For 2017, Novo Nordisk has completed the majority of formulary negotiations in the USA and average prices after rebates are expected to be moderately lower, while the market access for the Novo Nordisk products is expected to remain largely unchanged.

14.     Despite this affirmation, Novo Nordisk announced on September 1, 2016 that Sorensen, its long-serving CEO, who was nominated as best CEO in the world in 2015 and 2016 by Harvard Review, Sorensen, would unexpectedly retire by year-end 2016, three years before his contract was set to expire in 2019.  The accelerated retirement of Sorensen was contrary to the Company's past public statements, which assured investors that Sorensen would see out his contract until 2019, and directly coincided with intensified pricing pressure from U.S. payers.

15.     Then, on September 29, 2016, the Company announced that it would be laying off approximately 1,000 of its employees, representing two percent of its total work force, in direct response to the "increasing competition and resistance to high prices for diabetes products in the U.S." Novo Nordisk further announced that the pricing uncertainty was likely to extend into 2018, belying its previous affirmations that the Company's earnings and projections were stable and "expected to remain largely unchanged." On this news, the Company's ADR price declined approximately 5 percent from $43.74 per share on September 28 to $41.59 per share on September 30, 2016.

16.     Soon thereafter, on October 28, 2016, Novo Nordisk announced third quarter financial results for the 2016 fiscal year and again cut its forecast for full-year profit growth and narrowed its sales and operating profit outlook from 5 to 6 percent and 5 to 7 percent, respectively.  Despite its past positive representations, the Company disclosed for the first time that: "***Since February 2016***, the market environment in the USA within both diabetes care and biopharmaceuticals ***has become significantly more challenging, negatively impacting future pricing for Novo Nordisk's products,*** especially for insulin and human growth hormone products." (Emphases added.) Novo Nordisk further directed investors to expect "low single-digit growth in sales and flat-to-low single-digit growth in operating profit."

17.     Separately, Novo Nordisk announced on October 28 that it had received a Civil Investigative Demand from the U.S. Attorney's Office for the Southern District of New York seeking information relating to Novo Nordisk's contracts and business relationships with PBMs concerning its insulin products NovoLog, Novolin, and Levemir.  Later the same day, the Company's Chief Financial Officer Jesper Brandgaard ("Brandgaard") stated in an interview

with Bloomberg that "[w]e're only just getting into the storm now" in reference to the U.S. pressure on drug prices.

18.     On this news, the price of Novo Nordisk ADRs declined from a closing share price of $40.94 per share on October 27 to close at $35.54 per share on October 31, 2016 *a loss of more than 13%*, on extremely heavy trading volume.  In total, the Company's ADR price declined approximately 38% between August and November 2016.  This represents a market cap and investor loss of over $45 billion, much of which could have been prevented by honest and truthful communication of market realities during the preceding 12-18 months.

19.     Following the close of the Class Period, on November 3, 2016, Senator Bernie Sanders and Representative Elijah Cummings sent a letter to the U.S. Department of Justice calling on federal antitrust regulators to probe illegal collusion by Novo Nordisk, Sanofi, and Eli Lilly to set the prices for insulin and other diabetes drugs.  Furthermore, in a tacit acknowledgement of its improper pricing conduct, which continued beyond the dismantling of its previous oligopoly, Novo Nordisk pledged on November 30, 2016 to limit all future drug list price increases to single-digit percentages.

## JURISDICTION AND VENUE

20.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.  In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone

communications, and the facilities of the New York Stock Exchange ("NYSE"), a national

securities exchange.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the

Exchange Act.

## **PARTIES**

23.     Plaintiff, a citizen of Merrimack County, New Hampshire, purchased Novo

Nordisk securities as set forth herein and in his certification filed herewith.

24.     Novo Nordisk is a corporation incorporated in Denmark with United States

headquarters located at 800 Schudders Mill Road, Plainsboro, New Jersey 08536.  Its ADRs

trade on the NYSE under the symbol, "NVO." The Company was originally formed in 1989 by a

merger of two Danish companies, Nordisk Gentofte A/S and Novo Industri A/S, and as of

December 31, 2015, had over 240 million ADRs outstanding, owned by hundreds or thousands

of investors.

25.     Sorensen was the CEO of Novo Nordisk through all times relevant hereto.  On

September 1, 2016, the Company announced Sorensen would retire as CEO effective year-end

2016 after nearly 16 years in the position and three years before his contract was set to expire in

2019.

26.     Brandgaard is the Company's Chief Financial Officer and Executive Vice

President.  Brandgaard joined Novo Nordisk in 1999 as a senior Vice President of Finance.

27.     Sorensen and Brandgaard are collectively referred to herein as the "Individual

Defendants."

28.     Novo Nordisk and the Individual Defendants are collectively referred to herein as

"Defendants."

## CONTROL PERSON ALLEGATIONS

29.     By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Novo Nordisk's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**I.    Novo Nordisk Operates an Oligopoly for Years Undetected**

30.     Founded in 1923, Novo Nordisk is a pharmaceutical company and the world's largest maker of insulin and medicines and devices for diabetes and obesity.  Since its early founding, Novo Nordisk has become a pharmaceutical giant focusing on four specific segments: diabetes, obesity, hemophilia and growth disorders.  While the Company has activities in multiple areas, its primary focus is diabetes.  To this end, it has a market share of roughly a quarter in the worldwide diabetes market in terms of value, and controls nearly half the market in terms of volume, supplying some 27 million diabetes patients each year.

31.     There are over 400 million people suffering from diabetes, a number forecasted to rise to 600 million by 2040.  Treating diabetes is mostly done by insulin (56% of the market), oral (37% of the market) and GLP-1 products making up the remainder of the market.  Novo Nordisk focuses on both insulin and GLP-1 products, effectively targeting two-thirds of the global market.  Accordingly, for the fiscal year 2015, Novo Nordisk posted sales of DKK 108 billion, implying a value in U.S. dollars of approximately $15 billion.  Roughly 60 percent of these sales were generated from the sale of diabetes and obesity drugs.

32.     While there are millions of patients with diabetes, the world market for insulin is dominated by Novo Nordisk, Sanofi, and Eli Lilly.  To capitalize on their oligopoly, the three major players in the insulin market colluded for years to increase the prices of their drugs.  Indeed, according to an analysis prepared by the *Washington Post*, over the past two decades, Novo Nordisk was able to raise the price of its insulin drugs 450% above the rate of inflation.  From 2010-2015, the Company raised the price of its signature diabetes drug Levemir by 169%, including a 30% increase between 2014 and 2015 alone.  As Novo Nordisk recently admitted, these price increases were so significant that "many patients simply can't afford the medicine they need."

33.     Critically, these price increases often increased in lock-step with price increases by the Company's purported competitors.  For instance, from 2014 to 2015, the price of both Sanofi's Lantus and Novo Nordisk's Levemir reportedly increased by 29.9 percent, and each drug had an identical wholesale price of $29.82 per milliliter.  In fact, in 13 instances since 2009, the prices of Levemir and Lantus have increased in tandem in the U.S.  As demonstrated by the chart below, the prices of several insulin drugs have exhibited a series of significant, and suspiciously timed price increases:



JEFFERY DELVISCIO/STAT
Source: Truven Health Analytics

34.    The Company's pricing practices even recently spurred various legislators, including Senator Bernie Sanders and Representative Elijah Cummings, to issue a public letter on November 3, 2016 (following the close of the Class Period) asking both the Department of Justice and the Federal Trade Commission to investigate Novo Nordisk and its major competitors for price collusion.  The letter expressed concern that the drug companies may have been coordinating their pricing and, as a result, driving up the cost for millions of Americans, including both patients and taxpayers.  In support, the lawmakers pointed to numerous instances in which the prices of Novo Nordisk insulin brands rose in lockstep with its competitors.

35.    Nevertheless, until recently, Novo Nordisk's collusive strategy was a success and its earnings soared as a result of its ability to increase prices at unprecedented levels between 2010 and 2015.  Indeed, while the cost of insulin more than tripled — from $231 to $736 a year per patient — between 2002 and 2013, Novo Nordisk delivered 12% annual sales growth, 20% growth in operating profit, and 22% growth in earnings year-over-year.

II.    **Novo Nordisk's Oligopoly Dismantles and the Company Conducts Stock Buybacks to Stabilize its ADR Price**

36.    After years of consistently raising prices for insulin, the oligopoly Novo Nordisk had created began to experience significant pressure from United States payers beginning in 2015 – evidenced at least as much by the post-Class Period letter by Senator Sanders.  As a result, the oligopoly dismantled and many of the Company's competitors negotiated with U.S. payers to cut or flatten their prices in order to retain lucrative contracts with PBSs like Express Scripts.

37.    While many of Novo Nordisk's competitors lowered their prices, Novo Nordisk resorted to its current business model involving a combination of aggressive pricing of its insulin-related products and hefty stock buybacks to stabilize its ADR price.

38.    Novo Nordisk first announced its share repurchase program on May 11, 2015, announcing an overall share purchase program of up to DKK 17.5 billion to be executed during a 12-month period beginning January 30, 2015.  Under this program, Novo Nordisk initiated its first major stock buyback on April 30, 2015, intending to repurchase the Company's B shares for an amount up to DKK 9.3 billion between April 30 and October 21, 2015.  This repurchase was followed almost immediately by the initiation of a second stock buyback on December 24, 2015, intending to repurchase additional Company B shares for an amount of up to DKK 4.5 billion between October 29, 2015 and February 1, 2016.

39.    The repurchases continued in this back-to-back fashion over the course of 2016 and into the recent 2017 fiscal year.  For instance, on February 3, 2016 – only two days after the last share repurchase program had completed – Novo Nordisk initiated a third stock buyback to repurchase B shares for an amount of up to DKK 14 billion in the period from February 3, 2016 to April 27, 2016.  The buyback was followed by a fourth buyback initiated on April 29, 2016 to repurchase B shares for an amount up to DKK 3.5 billion between April 29, 2016 and August 3,

2016, a fifth buyback initiated on August 5, 2016 to repurchase B shares for an amount up to DKK 3.4 billion until October 26, 2016, and a sixth buyback initiated on October 28, 2016 to repurchase B shares for an amount up to DKK 4.5 billion until January 31, 2017.

40.    While the stock buyback program artificially stabilized the Company's ADR price, Defendants reported impressive revenue, operating profit growth and sales growth.  Moreover, the Company's executives even informed investors that the Company would achieve sales and operating profit growth of between 5% and 9% in 2016, as well as 10% operating profit growth over the long-term, while its main competitors were acknowledging to their investors that revenue from their insulin franchises would dwindle given the increased pricing pressures.  All the while, however, Defendants were informed by the Company's U.S. organization and knew from other data sources that Novo Nordisk's aggressive pricing model produced unsustainable revenue growth, and its inflated earnings and forecasts concealed the true extent of the pricing pressures.

**III.    Novo Nordisk Makes Material Misrepresentations and Omissions during the Class Period**

41.    Since February 5, 2015, Novo Nordisk and certain of its officers and directors have misrepresented the efficacy of its business model and its ability to maintain sustainable revenue.  For example, on February 5, 2015, the beginning of the Class Period, Novo Nordisk filed its 2014 Annual Report on Form 20-F for the period ended December 31, 2014 ("2014 Annual Report") with the SEC.  Defendants Sorensen and Brandgaard signed the 2014 Annual Report.  Therein, the Company touted the efficacy of its business model stating in relevant part through a letter by Chairman and Individual Defendant Ando:

> In my letter in last year's annual report, I expressed the Board of Directors' confidence **that Novo Nordisk would continue to do very well despite having been faced with several challenges in 2013. Today, writing this year's letter, I feel we have even more reason to be**

14

**confident. 2014 has shown that Novo Nordisk responds well to challenges**.

The Product Supply and Quality organisations have done an excellent job in addressing the findings raised by the US Food and Drug Administration (FDA) in 2012 in connection with the inspection of a production plant in Denmark, while at the same time expanding output to meet the increasing demand for Novo Nordisk's products.

**Novo Nordisk's US organisation responded quickly and professionally to what was a very tough start to 2014 when the effect of a major contract loss in 2013 in particular meant that sales in the first quarters fell short of expectations**.

The Global Research organisation has swiftly aligned itself with our decision to discontinue research within inflammatory disorders. As a result, Novo Nordisk is able to increase its research within diabetes prevention and treatment, obesity and diabetes complications. The above four cases are just examples, but important ones, that show me and the rest of the Board that **Novo Nordisk has retained the agility to deal effectively with both challenges and opportunities, despite having grown into a large, global company over the past 10 years**.

**Like we do every year, the Board has reviewed the company's longterm strategy, and we have found it to be sound – ambitious, yet realistic and a solid basis for future growth**. We have also evaluated the strength of the company's executive leadership and senior management. Together with the executive team we have assessed the company's organisational strengths and weaknesses. Whenever we have identified issues that could become a significant obstacle to meeting the company's long-term goals, we have agreed on a plan of action.

**We are confident that with Chief Executive Officer Lars Rebien Sørensen and his management team, we have the leadership needed to execute Novo Nordisk's strategy effectively**. In 2014, I had the pleasure of working more closely with Chief Operating Officer Kåre Schultz, who was appointed President in January 2014 as a reflection of the importance and complexity of his organisation and his successful management of it. The two newest members of the team, Lars Fruergaard Jørgensen and Jakob Riis, have both been given greater responsibilities in recognition of the strong leadership they have shown of their organisations. This, unfortunately, meant that Lise Kingo, whose remit became narrower as a result, decided to leave after a long and successful career at Novo Nordisk. I wish her all the best.

(Emphases added.)

42.     These overtly positive representations continued in Form 20-F's, Form 6-K's, and Company press releases filed or issued throughout the Class Period.  Each of these documents were signed and certified as accurate by Defendants Sorensen and Brandgaard.

43.     For instance, on April 30, 2015, Novo Nordisk held its earnings conference call for the first quarter of 2015.  On that call, Defendant Sorensen announced that the Company achieved operating profit growth of 17% (to $2.1 billion) and sales growth of 9% (to $3.8 billion), primarily driven by success in its North America segment.  Further, Defendant Sorensen assured investors that the Company was "not anticipating any pricing impact in 2015," and with specific regard to the Company's Victoza drug, that the Company is in "a very strong position with a gold standard product, one should expect that we will hold our position firm on [] pricing."

44.     In fact, a Danske Bank analyst specifically asked Novo Nordisk on April 30 whether it could still "come back to double-digit growth in the insulin market" given that the Company's competitors were reporting weak underlying growth of "between 1% and 2%" which was due in large part to "the pressure on prices in U.S." However, Defendant Sorensen simply dismissed the analyst's concerns and told investors that despite the pricing pressures, the Company will still be able to "achieve 10% or more top-line growth in the diabetes market."

45.     Similarly, on August 6, 2015, the Company held its earnings conference call for the second quarter of 2015.  During that call, Defendant Sorensen reported growth of 16% in operating profit (to $3.9 billion) as well as growth of 9% in sales (to $7.8 billion) for the first six months of 2015.  The growth was again purportedly driven by strength in the Company's North America operations and, in particular, increased sales of Victoza and Levemir.  With regard to the pricing of the Company's drugs, Defendant Sorensen stated that the Company experienced

16

"flat pricing" due to "the strong performance of Victoza, where we have pricing power because we are the gold standard in that market.  When we look at insulins going forward, we are looking at full-year expectations from flat to slight positive pricing."

46.     Further, Defendant Brandgaard stated on the August 6 earnings conference call, *inter alia*, that "there is a positive impact on our gross margin to the magnitude of 50 basis points . . . basically coming from an overall higher sales . . . [of] higher value products.  And that trend is expected to continue into second half and potentially also 2016."

47.     The Company next held its earnings conference call for the third quarter of 2015 on October 29, 2015.  On that call, Defendant Sorensen touted that the Company achieved 9% sales growth (to $11.8 billion) and 16% operating profit growth (to $5.7 billion) in the first nine months of 2015 driven in part by (again) strength in Novo Nordisk's North America business, with the "highest contribution coming from Victoza and Levemir." Defendant Sorensen also told investors that the Company expected to achieve mid-to-high single-digit sales growth in 2016, as well as a 3% increase in pricing.

48.     According to Defendant Brandgaard, moreover, the Company expected to achieve sales growth for 2015 of 7% to 9%, along with operating profit growth of roughly 20%. Defendant Brandgaard also reiterated that the Company expected to achieve mid-to-high single-digit sales growth in 2016, and that Novo Nordisk expected operating profit growth to increase by the same amount.  According to Brandgaard, this "reflect[s] expectations for continued robust performance of the portfolio of modern insulins, Tresiba and Victoza."

49.     Further, on February 3, 2016, the Company held its earnings conference call for the fourth quarter and full year of 2015, during which Defendant Sorensen announced operating profit growth of 14% (to $7.4 billion) and sales growth of 8% (to $16 billion), again driven by

strength in the Company's North America operations, "with the largest contributions coming from Victoza and Levemir." Defendant Sorensen also told investors that the Company would achieve 10% operating profit growth over the long-term.

50.     According to Defendant Brandgaard, sales and operating profit growth in 2016 would be between 5% and 9%, but would reach or exceed 10% over the long-term, "reflecting the current outlook for organic sales growth and the opportunities for operating margin leverage." Defendant Brandgaard also unequivocally stated that "if you look to 2015 and become very concrete, then you could say in 2015 we basically had no effect from prices on our average gross margin."

51.     This earnings call was soon followed, on February 10, 2016, by Novo Nordisk's filing with the SEC of its most recent 2015 Annual Report on Form 20-F for the period ended December 31, 2015 ("2015 Annual Report").  Defendants Sorensen and Brandgaard signed the 2015 Annual Report.  Therein, the Company touted the efficacy of its business model stating in relevant part through a letter by Novo Nordisk's Chairman, Görman Ando:

> **2015 was a good year for Novo Nordisk**. This is how the Board of Directors sees it when taking stock of the year that is now behind us. I hope that you will agree with us.
>
> In a difficult and changing environment for the pharmaceutical industry, Novo Nordisk delivered on the forecasts it made at the beginning of the year, both in terms of sales growth and profit growth. Equally important was the encouraging progress in the company's pipeline of new and upcoming products, which bodes well for the future.
>
> In his review of the year on the following pages, President and CEO Lars Rebien Sørensen highlights some of the key developments and achievements in 2015, including the launch of Saxenda® for the treatment of obesity, the flow of encouraging phase 2 and 3 data regarding semaglutide in both an injectable and an oral version for type 2 diabetes, and, of course, the long-awaited approval of Tresiba® in the US. **These achievements are the result of a very robust longterm strategy and excellent execution by the entire Novo Nordisk organisation. Every**

**year we spend a considerable amount of time in board meetings and in meetings with members of Executive Management reviewing this strategy – challenging assumptions and bringing in new perspectives to be sure not only that the company's strategic priorities are the right ones, but also that the organisation has the capabilities needed to execute them**.

**If you have been following Novo Nordisk for some years, you will notice from the article on pages 16–17 that we have not made any significant changes to the strategy in 2015**. This means the company will retain its sharp focus on just four disease areas: diabetes, obesity, haemophilia and growth disorders. Many of our discussions last year focused on how best to ensure that Novo Nordisk can continue its track record of innovation within these areas, so that we will have new and better medicines also in the coming decades for people with these serious chronic conditions. This requires further expansion of our research organisations in Europe, the US and China, and also that we become even more active in forming partnerships with biotech companies and universities that have knowledge and technologies that complement what we have in-house.

One of the main responsibilities of a board is to ensure that the company has the right executive leadership and that there are solid succession plans in place for top management. In April, we announced significant changes to the organisation's leadership, elevating the heads of our commercial activities in the US, Europe and International Operations, and of Product Supply to Executive Management. Moreover, Jakob Riis, executive vice president, Marketing, Medical Affairs and Stakeholder Engagement, was given additional responsibility for China, Japan, Korea, Australasia and Canada. The Board also decided that CEO Lars Rebien Sørensen should remain in his role until he approaches the end of his contract, which expires in 2019.

**In light of Novo Nordisk's solid performance in 2015**, the Board will at the Annual General Meeting propose a 28% increase in dividend to 6.40 Danish kroner per share. **Furthermore, the Board has decided to initiate a new share repurchase programme of up to 14 billion kroner, which will commence in February 2016, and intends to introduce an interim dividend for 2016 in August 2016. With the financial results for 2015, we have achieved the longterm financial targets that we last revised in January 2013. In light of the significant improvement in operating margin during the past years and the need to invest in sustaining sales growth**, further improvement of the operating margin is not a strategic priority in the coming years.

> **Reflecting this, we have set the long-term target for operating profit growth at 10%, underlining our confidence in the growth outlook for the company**. On behalf of the Board of Directors, I would like to express my appreciation for the leadership shown by Lars Rebien Sørensen and his management team, and for the hard work and dedication of the entire Novo Nordisk organisation.

(Emphases added.)

52.     Finally, Novo Nordisk held its earnings conference call for the first quarter of 2016 on April 29, 2016.  On that day, Defendant Sorensen announced that the Company achieved sales growth of 9% (to $4 billion) and operating profit growth of 10% (after adjusting for a partial divestment of a division) driven by strength in the Company's operations in the United States and particularly Victoza and Levemir.  Defendant Sorensen also reiterated that the Company expected to achieve sales and operating profit growth of between 5% and 9% in 2016.

53.     Further, according to Defendant Sorensen, the Company saw "still quite strong growth of Levemir in the U.S. . . .  There is some volume, but there is also a price effect.  We took a price increase last year." Defendant Brandgaard similarly reiterated that the Company expected to achieve 5%-9% in sales and operating profit growth in 2016 given "a continued robust performance for our modern insulins . . . Victoza and Tresiba."

54.     At all relevant times, these statements were false and misleading because Novo Nordisk's business model involved a combination of aggressive pricing of its insulin-related products and aggressive stock buybacks to stabilize its ADR price that would ultimately prove to be unsustainable and subject the Company to multiple government probes and investigations and missed earnings.  At all times relevant hereto, Novo Nordisk's aggressive pricing model produced unsustainable revenues as increased pricing pressure from United States payers exploded over the past few fiscal years.  Despite this, Novo Nordisk and certain of its officers and directors continued to misrepresent the efficacy of its business model and its ability to maintain sustainable revenue.

**IV.     The Market Finally Learns the Truth Regarding Novo Nordisk's Unsustainable Business Model**

55.     The truth regarding the efficacy of the Company's business model and its ability to maintain sustainable revenue was ultimately revealed to the market through a series of partial disclosures between August and October 2016.  The first disclosure came on August 2, 2016, when Novo Nordisk's Victoza was placed on the exclusion list for at least the second consecutive year by Express Scripts due to the Company's alleged artificial price inflation of the drug.  Shortly thereafter, on August 5, 2016, Novo Nordisk announced second quarter financial results for the 2016 fiscal year.  Therein, the Company cut its forecast for full-year profit growth and said it expected tough competition in the United States to pressure prices next year.  The press release stated in relevant part:

> ***For 2016, the range for expected sales growth has been narrowed to 5-7% and growth in adjusted operating profit is now expected to be 5-8%, both measured in local currencies***. For 2017, Novo Nordisk has completed the majority of formulary negotiations in the USA and average prices after rebates are expected to be moderately lower, while the market access for the Novo Nordisk products is expected to remain largely unchanged.
>
> Lars Rebien Sørensen, president and CEO: "Overall, we are satisfied with the performance in the first six months of 2016 where Victoza® and Tresiba® continued to deliver strong sales growth and Region China improved faster than expected. ***In the USA, the market environment is becoming increasingly challenging and contract negotiations for 2017 have reflected an intensifying price competition***. In spite of this, we see significant growth opportunities based on our strong diabetes care portfolio."

(Emphases added.)

56.     On this news the Company's ADR price declined 14.6 percent from $55.20 per share on August 4 to $47.13 per share on August 8, 2016.  In total, the price of Novo Nordisk's

ADRs declined a significant 18.9% in August alone from $57.05 per share on August 1 to $46.72

per share by August 31, 2016.

57.    Notably, however, even the August 5 revelation itself was tempered by the

Company's attendant affirmations that the revised guidance was stable and supported by the

Company's business model, stating:

> For 2017, Novo Nordisk has completed the majority of formulary
> negotiations in the USA and average prices after rebates are expected to be
> moderately lower, while the market access for the Novo Nordisk products
> is expected to remain largely unchanged.

58.    Yet despite this affirmation of stability, on September 29, 2016, the Company

announced that it would be laying off approximately 1,000 of its employees, representing two

percent of its total work force, in direct response to the "increasing competition and resistance to

high prices for diabetes products in the U.S." Novo Nordisk further announced that the pricing

uncertainty was likely to extend into 2018, belying its previous affirmations that the Company's

earnings and projections were stable and "expected to remain largely unchanged." On this news,

the Company's ADR price declined approximately 5 percent from $43.74 per share on

September 28 to $41.59 per share on September 30, 2016.

59.    Then, on October 28, 2016, Novo Nordisk announced third quarter financial results

for the 2016 fiscal year and again cut its forecast for full-year profit growth and narrowed its sales

and operating profit outlook from 5 to 6 percent and 5 to 7 percent, respectively.  Despite its past

positive representations, the Company disclosed for the first time that: "***Since February 2016***, the

market environment in the USA within both diabetes care and biopharmaceuticals ***has become***

***significantly more challenging, negatively impacting future pricing for Novo Nordisk's products,***

especially for insulin and human growth hormone products." (Emphases added.) Novo Nordisk

further directed investors to expect "low single-digit growth in sales and flat-to-low single-digit growth in operating profit." The press release stated in relevant part:

> Operating profit decreased by 1% reported in local currencies and by 3% in Danish kroner to DKK 37.2 billion. Adjusted for the non-recurring income related to the partial divestment of NNIT and the income related to out-licensing of assets for inflammatory disorders, both in 2015, operating profit in local currencies increased by 7%.

> Net profit increased by 10% to DKK 29.2 billion. Diluted earnings per share increased by 12% to DKK 11.50. Adjusted for the partial divestment of NNIT, net profit and diluted earnings per share increased by 20% and 22% respectively.

> In September, Novo Nordisk announced that Lars Rebien Sørensen, president and chief executive officer, will retire from the company by the end of 2016. Lars Fruergaard Jørgensen, currently executive vice president and head of Corporate Development, will succeed him, effective 1 January 2017.

> In September, Novo Nordisk announced plans to reduce the workforce by approximately 1,000 employees of the 42,600 positions in the company's global organisation.

> *For 2016, the range for sales growth is now expected to be 5-6%, and growth in adjusted operating profit is now expected to be 5-7%, both measured in local currencies.*

> *During 2016, the market environment in the USA has become significantly more challenging, negatively impacting future pricing for Novo Nordisk's products. Consequently, the preliminary outlook for 2017 in local currencies indicates low single-digit growth in sales and flat to low single-digit growth in operating profit. Furthermore, Novo Nordisk no longer deems it achievable to reach the operating profit growth target of 10%, set in February 2016. As a result, the target has been revised and Novo Nordisk is now aiming for an average operating profit growth of 5%.* The two other long-term financial targets remain unchanged.

> Lars Rebien Sørensen, president and CEO: "We have reassessed our long-term target for operating profit growth and our R&D strategy in the light of the challenging market environment in the USA. As a result, we are reducing our global cost base and parting company with some of our valued employees. Going forward we are confident that our strong product portfolio with innovative products like Tresiba®, Victoza® and semaglutide will enable us to deliver on our revised growth targets."

(Emphasis added.)

60.     Separately, Novo Nordisk announced on October 28 that it had received a Civil Investigative Demand from the U.S. Attorney's Office for the Southern District of New York seeking information relating to Novo Nordisk's contracts and business relationships with PBMs concerning its insulin products named NovoLog, Novolin and Levemir.  Later the same day, Defendant Brandgaard stated in an interview with Bloomberg that "[w]e're only just getting into the storm now" in reference to the U.S. pressure on drug prices.

61.     On this news, the price of Novo Nordisk ADRs declined from a closing share price of $40.94 per share on October 27 to close at $35.54 per share on October 31, 2016 *a loss of more than 13%*, on extremely heavy trading volume.  In total, the Company's ADR price declined approximately 38% between August and November 2016.

## ADDITIONAL SCIENTER ALLEGATIONS

62.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Novo Nordisk, their control over, and/or receipt and/or modification of Novo Nordisk's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Novo Nordisk, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

63. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Novo Nordisk's securities and operated as a fraud or deceit on Class Period purchasers of Novo Nordisk securities by materially misleading the investing public.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Novo Nordisk's securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Novo Nordisk securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

64. At all relevant times, the market for Novo Nordisk's securities was an efficient market for the following reasons, among others:

a) Novo Nordisk securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) Novo Nordisk filed periodic public reports with the SEC and the NYSE; and

c) Novo Nordisk regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

65. As a result of the foregoing, the market for Novo Nordisk's securities promptly digested current information regarding Novo Nordisk from all publicly available sources and

reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Novo Nordisk securities during the Class Period suffered similar injury through their purchase of Novo Nordisk securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

66.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Novo Nordisk who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Novo Nordisk securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns,

26

any entity in which Defendants have or had a controlling interest, and any judicial officer who handles this matter, and the staff of such judicial officers, as well as members of their immediate families.

68.     The members of the Class are so numerous that joinder of all members is impracticable, since Novo Nordisk has approximately 233 million ADRs outstanding and because the Company's shares were actively traded on the NYSE.  While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

69.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)      whether the price of Novo Nordisk securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Class have sustained damages as a result of the decline in value of Novo Nordisk's ADRs when the truth was revealed, and if so, what is the appropriate measure of damages.

70.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

71.      Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

72.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

73.      Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

74.      This Count is asserted by Plaintiff on behalf of himself and the Class against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

75.      During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and

maintain the market price of Novo Nordisk's ADRs; and (iii) cause Plaintiff and other members

of the Class to purchase or otherwise acquire Novo Nordisk's ADRs at artificially inflated prices.

In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of

them, took the actions set forth herein.

76.     Defendants, by the use of means and instrumentalities of interstate commerce: (i)

employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact

and/or omitted to state material facts necessary to make the statements made not misleading; and

(iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon

the purchasers and acquirers of the Company's ADRs in an effort to maintain artificially high

market prices for Novo Nordisk's ADRs in violation of Section 10(b) of the Exchange Act and

Rule 10-5.

77.     As a result of their making and/or their substantial participation in the creation of

affirmative statements and reports to the investing public, Defendants had a duty to promptly

disseminate truthful information that would be material to investors in compliance with the

integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. §

229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect

to the Company's operations and performance so that the market prices of the Company's publicly

traded securities would be based on truthful, complete, and accurate information.  Defendants'

material misrepresentations and omissions as set forth herein violated that duty.

78.     Defendants engaged in the fraudulent activity described above knowingly and

intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff

and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

79.     As a result of Defendants' fraudulent activity, the market price of Novo Nordisk ADRs was artificially inflated during the Class Period.

80.     In ignorance of the true financial condition of Novo Nordisk, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Novo Nordisk containing the misleading information, purchased or otherwise acquired Novo Nordisk's ADRs at artificially inflated prices during the Class Period.

81.     Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Novo Nordisk's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiff and other members of the Class purchased Novo Nordisk's ADRs in reliance on the integrity of the market price of that ADR, and Defendants manipulated the price of Novo Nordisk's ADRs through their misconduct as described herein.  Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Novo Nordisk.

82.     Throughout the Class Period, Defendants were aware of material non-public information concerning Novo Nordisk fraudulent conduct (including the false and misleading statements described herein).  Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

83.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Novo Nordisk ADRs during the Class Period.

## COUNT II
## Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

84.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

85.     During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  Plaintiff and other members of the Class had no access to such information, which was, and remains, solely under the control of Defendants.

86.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual

31

Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

87.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Novo Nordisk's business, the information contained in its filings with the SEC, and its public statements.  Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, the Individual Defendants are responsible for the accuracy of Novo Nordisk's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

88.     The Individual Defendants acted as controlling persons of Novo Nordisk within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Novo Nordisk to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Novo Nordisk and all of its employees.  As alleged above, Novo Nordisk is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

89.     As a direct and proximate result of the wrongful conduct of Novo Nordisk and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and her counsel as Class counsel;

B.     Awarding Plaintiff and the members of the Class damages, including interest;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: January 25, 2017             **LITE DEPALMA GREENBERG, LLC**


                                   /s/ *Bruce D. Greenberg*
                                   Bruce D. Greenberg
                                   570 Broad Street, Suite 1201
                                   Newark, NJ 07102
                                   Telephone: (973) 623-3000
                                   Facsimile: (973) 623-0858
                                   bgreenberg@litedepalma.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil action:

- *Lehigh County Employees' Retirement System v. Novo Nordisk A/S et al.*, Docket No. 3:17-cv-00209 (D.N.J. Jan 11, 2017)

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: January 25, 2017          **LITE DEPALMA GREENBERG, LLC**


                                /s/ *Bruce D. Greenberg*
                                Bruce D. Greenberg
                                570 Broad Street, Suite 1201
                                Newark, NJ 07102
                                Telephone: (973) 623-3000
                                Facsimile: (973) 623-0858
                                bgreenberg@litedepalma.com

                                **POMERANTZ LLP**
                                Jeremy A. Lieberman
                                J. Alexander Hood II
                                600 Third Avenue, 20th Floor
                                New York, New York 10016
                                Telephone:  (212) 661-1100
                                Facsimile:  (212) 661-8665
                                Email:  jalieberman@pomlaw.com
                                       ahood@pomlaw.com

                                **POMERANTZ LLP**
                                Patrick V. Dahlstrom
                                10 South La Salle Street, Suite 3505
                                Chicago, Illinois 60603
                                Telephone:  (312) 377-1181
                                Facsimile:  (312) 377-1184
                                Email:  pdahlstrom@pomlaw.com

                                *Attorneys for Plaintiff*